IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.  Criminal Case No. 3:08cr326

JUSTIN EUGENE TAYLOR,

Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Justin Eugene Taylor's Motion for Compassionate Release pursuant to Section 603(b) of the First Step Act (the "Motion for Compassionate Release"). (ECF No. 123.) The United States responded in opposition, (ECF No. 127), and Mr. Taylor replied, (ECF No. 128).

This matter is ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. For the reasons articulated below, Court will deny the Motion for Compassionate Release.

### I. Background

#### A.   Mr. Taylor's Underlying Offense

On February 4, 2009, a Grand Jury for the Eastern District of Virginia, Richmond Division, returned a seven-count Second Superseding Indictment charging Mr. Taylor with: conspiracy to possess with intent to distribute and distribute marijuana in violation of 21 U.S.C. § 846 (Count 1); attempt to distribute marijuana in violation of 21 U.S.C. § 846 (Count 2); possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c) (Count 3); use and carry of a firearm during and in relation to a drug trafficking crime in

violation of 18 U.S.C. § 924(c) (Count 4); conspiracy to interfere with commerce by threats and violence in violation of 18 U.S.C. § 1951 (Count 5); interference with commerce by threats and violence in violation of 18 U.S.C. §§ 2 and 1951 (Count 6); and, use and carry of a firearm during and in relation to a felony crime of violence in violation of 18 U.S.C. § 924(c) (Count 7). (ECF No. 17, at 1–4.)

On February 13, 2009, Mr. Taylor pleaded guilty to Counts 5 and 7 of the Second Superseding Indictment pursuant to a plea agreement. (ECF Nos. 30, 31.) As part of his plea agreement, Mr. Taylor signed a Statement of Facts describing the conduct underlying his offenses. (ECF No. 32.) "Starting before January 1, 2002, and continuing through December 14, 2003," Mr. Taylor conspired with others to distribute and possess with the intent to distribute marijuana. (ECF No. 32 ¶ 1.) In furtherance of this conspiracy, Mr. Taylor and others would obtain wholesale quantities of marijuana, which they would then distribute to their coconspirators for redistribution. (ECF No 32 ¶ 1.) Mr. Taylor and others would "arrange wholesale marijuana transactions and, rather than complete the transaction, would take money from the customer, intentionally fail to distribute the marijuana to the customer, and use the money to finance their own drug trafficking business." (ECF No. 32 ¶ 1.)

At some point prior to August 14, 2003, Mr. Taylor met with Martin Silvester and Jonathan Hartzell.[1] During that meeting, Mr. Taylor discussed his ability to supply Mr. Silvester with marijuana for redistribution. (ECF No. 32 ¶ 2.) On August 14, 2003, Mr. Taylor arranged another meeting with Mr. Silvester and Mr. Hartzell "for the purpose of distributing marijuana to [Mr.] S[i]lvester so that [Mr.] S[i]lvester could redistribute the marijuana to others." (ECF No.

---

[1] Due to an apparent scrivener's error, the Statement of Facts misspells Mr. Silvester's name as "Sylvester." (*Compare* ECF No. 32 *with* ECF No. 119 ¶¶ 32, 38.)

2

32 ¶ 3.) The three men met at the residence of a mutual acquaintance and then rode together in Mr. Hartzell's car to the area of Hanover Avenue and North Lombardy Street in Richmond, Virginia, in order to obtain marijuana for Mr. Silvester. (ECF No. 32 ¶ 3.) Upon arriving at that location, Mr. Taylor asked Mr. Silvester for the money to pay for the marijuana, but Mr. Silvester refused to pay Mr. Taylor until he saw the marijuana. (ECF No. 32 ¶ 3.) Mr. Taylor exited Mr. Hartzell's car to retrieve the marijuana, but he was "unable to do so." (ECF No. 32 ¶ 3.)

Mr. Taylor then contacted his coconspirator and "the two of them devised a plan to steal the money that [Mr.] S[i]lvester had to purchase the marijuana." (ECF No. 32 ¶ 4.) They agreed that the coconspirator, armed with a 9mm semiautomatic pistol, would pose as the drug dealer, meet with Mr. Silvester, and demand to see the purchase money, which the coconspirator would then take by force and flee in Mr. Taylor's car. (ECF No. 32 ¶ 4.)

Pursuant to the plan, the coconspirator entered a nearby alleyway. (ECF No. 32 ¶ 5.) Mr. Taylor called Mr. Silvester and told him to meet his coconspirator in the alley to obtain the marijuana. (ECF No. 32 ¶ 5.) Mr. Taylor waited in his car. (ECF No. 32 ¶ 5.) The coconspirator "met [Mr.] S[i]lvester in the alleyway, displayed the 9mm semiautomatic pistol[,] and demanded [Mr.] S[i]lvester's marijuana purchase money. [Mr.] S[i]lvester resisted, [and] the pistol discharged," and the coconspirator shot Mr. Silvester. (ECF No. 32 ¶ 6.) Mr. Silvester died the next day from the gunshot wound. (ECF No. 32 ¶ 6.)

After shooting Mr. Silvester, the coconspirator returned to Mr. Taylor's car and they fled the area. (ECF No. 32 ¶ 7.) Mr. Taylor "did not explicitly plan or agree to kill" Mr. Silvester as part of the plan with his coconspirator. (ECF No. 32 ¶ 4.)

B.  **Mr. Taylor's Sentence**

Prior to Mr. Taylor's sentencing, the United States Probation Office prepared a Presentence Report ("PSR"), summarizing Mr. Taylor's criminal history and personal characteristics, including his family circumstances. (ECF No. 119.) The PSR reported a Total Offense Level of 41 and a Criminal History Category of III, resulting in an advisory guideline range of 360 months to life. (ECF No. 119 ¶¶ 88–90.)

On May 14, 2009, the Court sentenced Mr. Taylor to a total of 360 months' imprisonment, including 240 months' imprisonment on Count 5 and 120 months' imprisonment on Count 7 to be served consecutively. (ECF No. 44, at 1, 3.)

On June 27, 2016, Mr. Taylor filed a motion pursuant to 28 U.S.C. § 2255 challenging his conviction for use and carry of a firearm during and in relation to a felony crime of violence in violation of 18 U.S.C. § 924(c) (Count 7). (ECF No. 76.) On August 26, 2019, this Court denied Mr. Taylor's § 2255 motion. (ECF Nos. 93, 94.) Mr. Taylor appealed the denial to the United States Court of Appeals for the Fourth Circuit, which vacated this Court's judgment. (ECF Nos. 99, 100.) The United States sought a writ of certiorari, (ECF No. 106), and on June 22, 2022, the United States Supreme Court affirmed the Fourth Circuit's opinion vacating Mr. Taylor's conviction on Count 7, (ECF No. 109).

On August 26, 2022, this Court issued an amended judgment removing the conviction in Count Seven and its associated sentence. (ECF No. 114.) Mr. Taylor is presently serving the 240-month sentence originally imposed on Count Five. He is currently housed at FCI Loretto in

Loretto, Pennsylvania. The Bureau of Prison ("BOP") lists Mr. Taylor's projected release date as April 16, 2026.[2]

On March 30, 2024, Mr. Taylor, acting through counsel, filed the instant Motion for Compassionate Release. (ECF No. 123.) In the Motion, Mr. Taylor asserts that two circumstances establish extraordinary and compelling reasons for his release: (1) his aunt's poor health and consequent need for care, (ECF No. 123, at 6–8), and (2) the BOP's revocation of earned time credits under the First Step Act ("FSA"), (ECF No. 123, at 8–9).

## II. Compassionate Release Under the First Step Act

### A. Legal Standard

Congress authorized "compassionate release" in 18 U.S.C. § 3582(c)(1)(A).[3] *United States v. Burleigh*, 145 F.4th 541, 547 (4th Cir. 2025). 18 U.S.C. § 3582(c) recognizes the

---

[2] *See* Federal Bureau of Prisons, *Find an Inmate*, http://bop.gov/inmateloc/ (last visited Jan. 27, 2026).

[3] 18 U.S.C. § 3582(c)(1)(A) provides:

(c) Modification of an imposed term of imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—(1) in any case-

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that–
>
> > (i) extraordinary and compelling reasons warrant such a reduction; or

5

"general rule" that a court cannot modify a sentence once it has been imposed. *Burleigh*, 145 F.4th at 547. But 18 U.S.C. § 3582(c)(1)(A) contains "an exception to that rule, in which courts may consider motions made by defendants who have exhausted their administrative remedies and are seeking a sentence modification." *Id.*

A court can grant a compassionate release motion if it finds that:

(1) "extraordinary and compelling reasons warrant such a reduction,"

(2) "such a reduction is consistent with applicable policy statements issued by the [United States] Sentencing Commission," and

(3) the 18 U.S.C. § 3553(a) factors weigh in favor of granting relief, to the extent that they are applicable.

*Burleigh*, 145 F.4th at 547 (citing 18 U.S.C. § 3582(c)(1)).

The defendant bears the burden to prove that extraordinary and compelling conditions exist for release under § 3582(c)(1)(A). *See United States v. Wesley*, No. 1:97-cr-382-2 (JKW), 2025 WL 2623449, at *2 (E.D. Va. Sept. 11, 2025) (citing *United States v. Hargrove*, 30 F.4th 189, 195 (4th Cir. 2022)).

---

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

6

1.  **Elements 1 and 2: Extraordinary and Compelling Reasons For a Reduction and the Sentencing Commission's Policy Statement**

"Elements one and two are supposed to work together." *Burleigh*, 145 F.4th at 547–48. "Because [§] 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release, the 'Sentencing Commission, pursuant to authority granted it by Congress,' does so instead." *Id.* (quoting *United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020)).

   i.  **The Sentencing Commission's Policy Statement**

The United States Sentencing Commission issued a policy statement governing extraordinary and compelling reasons that justify compassionate release. *See* U.S.S.G. § 1B1.13(b). It identifies six instructive categories of extraordinary and compelling reasons that may allow for a sentence reduction. These include:

> (1) certain medical circumstances of the defendant, such as terminal illness or the inability to receive specialized medical care while incarcerated;
>
> (2) the defendant's age;
>
> (3) the defendant's family circumstances;
>
> (4) the fact that the defendant, while in custody, was the victim of sexual or physical abuse committed by, or at the direction of, a correctional officer;
>
> (5) "any other circumstances or combination of circumstances . . . similar in gravity to" the circumstances "described in paragraphs (1) through (4)"; and
>
> (6) the defendant's receipt of an "unusually long sentence."

U.S.S.G. § 1B1.13(b)(1)–(6).[4]

Most pertinent here, § 1B1.13(b)(3), further provides that "extraordinary and compelling reasons" include:

---

[4] *See* Appendix A, U.S.S.G § 1B1.13(b) (2025).

>    (3) Family Circumstances of the Defendant.—
>
>>    (A) The death or incapacitation of the caregiver of the defendant's minor child or the defendant's child who is 18 years of age or older and incapable of self-care because of a mental or physical disability or a medical condition.
>>
>>    (B) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>>
>>    (C) The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent.
>>
>>    (D) The defendant establishes that circumstances similar to those listed in paragraphs (3)(A) through (3)(C) exist involving any other immediate family member or an individual whose relationship with the defendant is similar in kind to that of an immediate family member, when the defendant would be the only available caregiver for such family member or individual. For purposes of this provision, 'immediate family member' refers to any of the individuals listed in paragraphs (3)(A) through (3)(C) as well as a grandchild, grandparent, or sibling of the defendant.

U.S.S.G. § 1B1.13(b)(3)(A)–(D).

### ii.    Other Extraordinary and Compelling Circumstances

While the Sentencing Commission's policy statement on extraordinary and compelling circumstances is helpful, it is not binding. In considering whether "extraordinary and compelling reasons warrant . . . a reduction," 18 U.S.C. § 3582(c)(1)(A)(i), "district courts are empowered . . . to consider *any* extraordinary and compelling reason for release that a defendant might raise," *McCoy*, 981 F.3d at 284; *see also United States v. Davis*, 99 F.4th 647, 658 (4th Cir. 2024) (relying on *McCoy* and reiterating that "district courts [can] consider any extraordinary and compelling reasons for release raised by a defendant"). As the United States Court of Appeals for the Fourth Circuit recently explained, "there is no exhaustive list as to what may be considered extraordinary and compelling, and it is well within [a] district court's discretion to find other reasons"—that is, reasons other than those enumerated in the Sentencing

8

Commission's policy statement—"constitut[ing] an extraordinary and compelling factor that weigh[s] in favor of granting relief." *United States v. Johnson*, 143 F.4th 212, 216 (4th Cir. 2025) (upholding district court's grant of compassionate release where "the district court found the sentencing disparities" between the defendant and his coconspirators "constituted an extraordinary and compelling reason to grant compassionate release").

If extraordinary and compelling circumstances exist, the Court "must then consider whether the factors in § 3553(a) support such a decrease." *Burleigh*, 148 F.4th at 548.

### 2.     Element 3: The Statutory Sentencing Factors Enumerated In 18 U.S.C. § 3353(a)

"The § 3553(a) factors include 'the nature and nature and circumstances of the offense' as well as the defendant's history and characteristics, the 'kinds of sentences available,' and 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *Burleigh*, 148 F.4th at 548 (quoting § 3553(a)(1), (3), (6)). "They also include the need for the sentence 'to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment for the offense,' to deter criminal conduct, to protect the public and to provide the defendant with appropriate resources such as 'medical care' and 'vocational training.'" *Id.* (quoting § 3553(a)(2)).

District courts enjoy "'broad discretion'" in analyzing the § 3553(a) factors when considering a motion for compassionate release. *Id.* (quoting *United States v. Bethea*, 54 F.4th 826, 834 (4th Cir. 2022)). And "district courts are only required to address the § 3553(a) factors 'to the extent that they are applicable.'" *Id.* (quoting § 3553(a)).

### C.     Exhaustion of Administrative Remedies

A defendant seeking compassionate release is generally required to exhaust his or her administrative remedies prior to bringing a motion before the district court. To do so, the

9

defendant must first apply to the BOP to bring a motion on his or her behalf. 18 U.S.C. § 3582(c)(1)(A). After making the request to BOP, a defendant can proceed to district court under the earlier of one of "two routes." *United States v. Ferguson*, 55 F.4th 262, 268 (4th Cir. 2022) (quotation omitted).

Under the first route, a defendant may file a motion for compassionate release in a district court "after [he or she] has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on [his or her] behalf." 18 U.S.C. § 3582(c)(1)(A). That is, the defendant must exhaust his or her administrative remedies with the BOP. *Ferguson*, 55 F.4th at 268. The second route permits a defendant to "proceed directly to district court," *McCoy*, 981 F.3d at 283, if the BOP does not act on the defendant's request within "30 days from the receipt of such a request by the warden," 18 U.S.C. § 3582(c)(1)(A); *see also McCoy*, 981 F.3d at 283 ("Congress, aware of the BOP's history of extensive delays, also provided a '30-day lapse' alternative, under which a defendant may proceed directly to district court if his [or her] request is not acted on within that time.").

A court may waive the exhaustion requirement in certain circumstances, including where pursuing exhaustion would be futile, result in inadequate relief, or subject the defendant to undue prejudice. *United States v. Evans*, 504 F. Supp. 3d 519, 525 (E.D. Va. 2020). In addition, because the exhaustion requirement is "non-jurisdictional," it is "waived if . . . not timely raised" by the United States. *United States v. Muhammad*, 16 F.4th 126, 130 (4th Cir. 2021).

### III. Analysis

For the reasons articulated below, the Court will deny the Motion for Compassionate Release. (ECF No. 123.) Although the United States has waived any argument that Mr. Taylor failed to exhaust his administrative remedies, the Court concludes that Mr. Taylor does not offer

10

any extraordinary and compelling reasons to support his request for release. *See* 18 U.S.C. § 3582(c)(1)(A)(i). Even if he had done so, the § 3553(a) factors weigh against his release.

### A.   The United States Does Not Challenge Mr. Taylor's Exhaustion of His Administrative Remedies

Neither Mr. Taylor nor the United States discusses whether Mr. Taylor exhausted his administrative remedies by submitting a request for compassionate release to the BOP. (*See generally* ECF Nos. 123, 127.)[5] Because the United States does not argue that Mr. Taylor failed to exhaust his remedies, it waived any argument that Mr. Taylor's Motion for Compassionate Release is barred on this ground. *Muhammad*, 16 F.4th at 129–30. And, in any event, the Court waives the exhaustion requirement because requiring exhaustion given Mr. Taylor's upcoming release would result in inadequate relief or otherwise prejudice Mr. Taylor. *See Evans*, 504 F. Supp. 3d at 525.

The Court proceeds to consider the merits of Mr. Taylor's Motion for Compassionate Release.

### B.   Elements 1 and 2: The Motion for Compassionate Release Does Not Establish Extraordinary and Compelling Circumstances for Mr. Taylor's Release

Mr. Taylor argues that extraordinary and compelling circumstances exist for two reasons: (1) his family circumstances, (ECF No. 123, at 8), and (2) issues with how the BOP is

---

[5] Mr. Taylor's Motion for Compassionate Release identifies exhaustion of administrative remedies as a threshold requirement and submits that the "requirement[] [is] met here." (*See* ECF No. 123, at 7.) But the Court finds no mention of Mr. Taylor's request for compassionate release to the BOP, nor of any subsequent administrative appeals or a lapse in response from the BOP, elsewhere in the Motion for Compassionate Release.

A worksheet submitted by the United States Probation Office indicates that, as of April 5, 2024, BOP personnel "d[id] not have any requests for compassionate release from Mr. Taylor on file." (ECF No. 124, at 2.)

11

applying FSA credits to his sentence, (ECF No. 123, at 8–9).[6] The Court addresses each argument in turn below and finds that neither circumstance constitutes an extraordinary and compelling reason for release.

### 1. Mr. Taylor's Family Circumstances Are Not an Extraordinary and Compelling Circumstance

Mr. Taylor argues that his aunt's health is an extraordinary and compelling reason for compassionate release. (ECF No. 123, at 2.) Mr. Taylor explains that his aunt "has become unable to care for herself due to a number of serious health conditions," and that she is "without a permanent caretaker." (ECF No. 123, at 2, 4; *see* ECF No. 123-1.)

The Sentencing Guidelines provide that extraordinary and compelling reasons exist when a defendant "would be the only available caregiver" for an "immediate family member" or an "individual whose relationship with the defendant is similar in kind to that of an immediate family member." *See* U.S.S.G. § 1B1.13(b)(3)(D). The Guidelines further define "immediate family member" as a child, parent, grandchild, grandparent, or sibling of the defendant. *See* § 1B1.13(b)(3).

---

[6] It is not clear whether Mr. Taylor moves the Court to consider the revocation of his FSA credits as a basis for Compassionate Release. Indeed, Mr. Taylor explains—twice—that the "primary remedy for BOP improperly taking [his] First Step Act earned time credits away is to file a habeas corpus petition pursuant to 28 U.S.C. § 2241 in the district court where he lives." (*See* ECF No. 123, at 5–6, 9.) And he adds that "should this Court grant [his] compassionate release motion *so that he can care for his aunt*," he would not be required to litigate the revocation of his earned time credits through a § 2241 petition. (ECF No. 123, at 3 (emphasis added).)

To ensure full and careful consideration of the Motion for Compassionate Release, the Court nevertheless construes Mr. Taylor as seeking relief on this ground and considers it accordingly.

The United States argues that Mr. Taylor's aunt's health is not an extraordinary and compelling reason for release on two grounds: first, the United States argues that an aunt is not an "immediate family member" as defined in the policy statement, nor is Mr. Taylor's aunt an "individual whose relationship with the defendant is similar in kind to that of an immediate family member." (ECF No. 127, at 6 (citing § 1B1.13(b)(3)(D)).) Second, the United States argues that Mr. Taylor has not established that he is the *only* available caretaker for his aunt. (ECF No. 127, at 7.) The Court addresses each point below.

Mr. Taylor concedes that "aunt" is not identified as one of the family members identified in § 1B1.13(b)(3). (ECF No. 128, at 1.) But he argues that his aunt *is* an "individual whose relationship with the defendant is similar in kind to that of an immediate family member." (ECF No. 128, at 1–2.) *Cf. United States v. Uhuru*, No. 3:21-cr-145 (REP), 2025 WL 2607812, at *7–8 (E.D. Va. Sept. 9, 2025) (finding that the defendant failed to make a showing of extraordinary and compelling circumstances based on his uncle's Alzheimer's diagnosis because "there [was] no showing that [the defendant] ha[d] any special relationship with the uncle, which is an important component of the application of § 1B1.13(b)([3])"). Mr. Taylor explains that his aunt "raised him with her son" and "considers [him] her own son," that her residence is his home address, and that she is the "only remaining parental figure in [his] life." (ECF No. 123, at 2, 4.)

The United States counters that Mr. Taylor has not established that his relationship with his aunt is "similar in kind" to that of an immediate family member. (ECF No. 127, at 7.) That Mr. Taylor is "close with his . . . aunt[]," the United States contends, "does not mean that his

13

aunt [] was a mother to him, particularly where [his] mother was present in his life and raised him until he was an adult."[7] (ECF No. 127, at 7.)

Ultimately, the Court need not decide whether Mr. Taylor's relationship with his aunt is "similar in kind to that of an immediate family member" under § 1B1.13(b)(3)(D) because he has not shown, as he must, that he is the "*only* available caregiver" for his aunt. § 1B1.13(b)(3)(D). Mr. Taylor himself explains that his aunt's granddaughter is presently "caring for [her]." (ECF No. 123, at 4; ECF No. 128, at 3.) And while he emphasizes that the assistance is "temporary," (ECF No. 128, at 3), he provides little explanation as to how or why his aunt's granddaughter cannot continue to provide care for his aunt.[8]

Even if Mr. Taylor's aunt qualified as similar in kind to an immediate family member, the record shows that Mr. Taylor has two other maternal aunts who could possibly serve as caretakers. (ECF No. 127, at 7.) While the Court has no knowledge about the suitability of his other maternal aunts as caretakers, the Court nevertheless heeds the United States' argument that Mr. Taylor has more extended family that could aid in his aunt's care. Mr. Taylor simply is not the *only* person able to do so.

This decision is consistent with prior opinions of this Court, and others in the Eastern District of Virginia, which have consistently held that the failing health of a defendant's family member (notably, each of whom met the criteria for a "close family member") does not establish

---

[7] In arguing that Mr. Taylor's aunt does not meet this standard, the United States notes that Mr. Taylor's "mother was the one who provided information about [his] health history [in the PSR], not his aunt." (ECF No. 127, at 7 (citing ECF No. 119 ¶¶ 61–64).) But the PSR *also* reflects that Mr. Taylor's personal and family data were verified by his aunt. (ECF No. 119 ¶ 54.) Regardless, the Court does not find dispositive who verified Mr. Taylor's information in the PSR.

[8] One of Mr. Taylor's exhibits, a letter from a "Mitigation Specialist," suggests that Mr. Taylor's aunt's granddaughter "has her own family" and is "waiting on [Mr. Taylor] to return home so that she can move back across town to her own house." (ECF No. 123-4, at 1.)

14

an extraordinary and compelling reason for a defendant's release when other caregivers are available. *See United States v. Cogdell*, No. 3:16-cr-103-2 (MHL), 2025 WL 5193616, at *10–11 (E.D. Va. Dec. 20, 2024) (finding that defendant was not uniquely situated to tend to his father when his brother, mother, and sister had occupied caretaking roles); *United States v. Coleman*, No. 3:09-cr-207 (MHL), 2024 WL 1559535, at *8 (E.D. Va. Apr. 10, 2024) (explaining that defendant's release plans did not mention caring for his ailing mother but did reference other individuals who "could possibly be available caregivers"); *United States v. Brown*, No. 2:11-cr-152, 2024 WL 3357836, at *6 (E.D. Va. July 10, 2024) (finding that defendant was not the only available caregiver where defendant sought release "so that he [could] serve as his mother's caregiver while other family members [were] absent") (internal citation omitted); *Delavan v. United States*, No. 4:18-cr-023 (RAJ), 2024 WL 2958956, at *4 (E.D. Va. June 12, 2024) (finding that defendant was not the only available caretaker where defendant sought release to care for his elderly mother because the defendant had a son who could assist her and she lived in a care facility). The Court will not stray from these findings here.

The Court acknowledges the difficult struggles that Mr. Taylor's aunt experiences due to her health conditions and the likely emotional impact this has on Mr. Taylor, but it nevertheless finds that Mr. Taylor has not established that he is the *only* available caregiver for his aunt. For that reason, Mr. Taylor has not established that his aunt's medical needs constitute an extraordinary and compelling circumstance.

The Court next considers whether the revocation of Mr. Taylor's FSA credits is an extraordinary and compelling circumstance.

### 2. Revocation of Mr. Taylor's Earned Time Credits Under the First Step Act is Not an Extraordinary and Compelling Circumstance

Mr. Taylor also contends that the BOP improperly revoked a year of earned time credits he earned under the FSA after he declined to participate in a residential drug treatment program.[9] (ECF No. 123, at 5–6, 8–9.) Mr. Taylor appears to argue that his proper release date, FSA credits included, would be March 6, 2026. (ECF No. 123-9, at 1.) After his credits were "improperly" revoked, he faced a release date of March 6, 2027. (ECF No. 123-8.)

Mr. Taylor cannot challenge how the BOP applies FSA credits to his sentence in a motion for compassionate release. *See United States v. Wright*, No. ELH-08-0381, 2025 WL 1677005, at *15 (D. Md. June 13, 2025). Instead, the "appropriate vehicle" to challenge the BOP's failure to afford FSA credits is "a petition for writ of habeas corpus under 28 U.S.C. § 2241, not a motion for compassionate release."[10] *See Wright*, 2025 WL 1677005, at *15 (collecting cases); *see also United States v. Jones*, No. 2:19-cr-163-1 (JAG), ECF No. 188, at 5 (E.D. Va. July 31, 2025) ("Jones cannot challenge how the BOP applies FSA credits to his

---

[9] Under the FSA, eligible inmates "who successfully complete[] evidence-based recidivism programing or productive activities[] shall earn . . . 10 days of time credits for every 30 days of successful participation in evidence-based reduction programming or productive activities." 18 U.S.C. § 3632(d)(4)(A)(i). In addition, inmates determined by the BOP to be at a "minimum or low risk for recidivating[] shall earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities." 18 U.S.C. § 3632(d)(4)(A)(ii).

The BOP has promulgated regulations that govern how an inmate earns FSA time credits, 28 C.F.R. § 523.42, how the credits are applied to a sentence, *id.* § 523.44, and how inmates may lose the credits, *id.* § 523.43.

[10] Furthermore, as the United States correctly explains, "the basis for the alleged loss of [earned] time credit" is "not clearly established" here. (ECF No. 127, at 8–9.) Without a clear record as to *why* Mr. Taylor's FSA credits were revoked (which could be established in a properly filed 28 U.S.C. § 2241 petition), the Court could not rule on this issue.

16

sentence in a motion for compassionate release. Instead, a defendant should raise such challenges under a petition under 28 U.S.C. § 2241.").

Even if the Court were to consider Mr. Taylor's argument, a defendant's challenge to the BOP's calculation (or revocation) of FSA "credits does not qualify as an extraordinary and compelling circumstance." *Wright*, 2025 WL 1677005, at *16 (collecting cases). That is particularly so in this case. As Mr. Taylor explains in his reply, the "Bureau of Prisons has at least partially corrected its wrongful denial of Mr. Taylor's earned time credits." (ECF No. 128, at 3; *compare* ECF No. 123-9, at 1 (projecting March 6, 2026 release date as of January of 2023) *with* ECF No. 123-8 (projecting a March 6, 2027 release date as of February of 2024) *and* ECF No. 128-1 (projecting an April 16, 2026 release date as of June 2024). Mr. Taylor's projected release date is now April 16, 2026, just five weeks later than the date he contends appropriately reflects his FSA credits. Such a short period of time—particularly against the backdrop of Mr. Taylor's 240-month sentence—does not amount to an extraordinary and compelling circumstance.

In sum, neither Mr. Taylor's family circumstances nor the BOP's revocation of his FSA credits create an extraordinary or compelling circumstance that would compel a sentence reduction.

### C. **Element 3: The § 3553(a) Factors Do Not Support a Reduction in Mr. Taylor's Sentence**

Although Mr. Taylor does not satisfy the requirement for an "extraordinary and compelling" reason for his compassionate release, even if he had, the § 3553(a) factors weigh against his release. In the interest of creating a full record, the Court discusses those factors here.

First, the nature and circumstances of the offense, 18 U.S.C. § 3553(a)(1), do not support reducing his term of imprisonment. Mr. Taylor's offense of conviction is extremely serious.

17

Under the guise of selling large quantities of marijuana, Mr. Taylor assisted his coconspirator in organizing a meeting to rob a would-be drug purchaser at gunpoint, during which the purchaser was shot and killed. This conduct undoubtably is serious and weighs against release.

Next, Mr. Taylor's history and characteristics, § 3553(a)(1), do not support reducing his term of imprisonment. The Court commends Mr. Taylor for the personal growth the record reflects. During his fifteen years in federal custody, Mr. Taylor completed more than two dozen educational programs and paid off nearly two thirds of his restitution. (ECF No. 123, at 2.) But Mr. Taylor does not mention the seven disciplinary infractions he received while incarcerated, including "possessing a dangerous weapon." (ECF No. 124, at 1 (capitalization omitted).) And Mr. Taylor has a significant criminal history, particularly given that he has been incarcerated since 2006 and for most of his adult life, (ECF No. 119 ¶ 72), involving multiple convictions for drug offenses involving firearms, (ECF No. 119 ¶¶ 46–48). Mr. Taylor's personal growth, while laudable, does not negate his serious criminal history.

The Court must also consider the need for the sentence to protect the public. § 3553(a)(2)(A), (C). Mr. Taylor's release plans do not ensure the safety of the community. Mr. Taylor proposes returning to his aunt's home, where he was living time of the underlying offense. (ECF No. 123, at 10; ECF No. 119 ¶ 56.) And the PSR reflects that Mr. Taylor's aunt "is a gun owner and does sometimes have weapons in the house." (ECF No. 119 ¶ 56.) Considering that Mr. Taylor's criminal history involves firearms, including for the underlying offense, the Court is not persuaded that returning Mr. Taylor to the same place he was living at the time he committed the underlying offense, with access to a firearm, would ensure the community's safety.

The remaining factors, including the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and avoid unwanted sentencing disparities, weigh in Mr. Taylor's favor. § 3553(a)(2)(A)–(B), (a)(7). As of April 5, 2024, Mr. Taylor had served 172 months and 20 days of his 240-month sentence. (ECF No. 124, at 2.) Now, nearly two years later, Mr. Taylor has served nearly all of his twenty-year sentence. Nevertheless, given the nature and circumstances of the offense and the need to protect the public, the Court will not reduce Mr. Taylor's sentence.

On balance, the § 3553(a) factors do not outweigh the continuing need for the sentence imposed to reflect the seriousness of the offense for which he was sentenced. Mr. Taylor's 240-month sentence is sufficient but not greater than necessary to reflect the seriousness of his offense. The record before the Court does not justify Mr. Taylor's early release from federal imprisonment.

### IV. Conclusion

For the reasons articulated above, the Court will deny the Motion for Compassionate Release. (ECF No. 123.) The Court will deny as moot Mr. Taylor's *pro se* Motion for Compassionate Release. (ECF No. 115.)

An appropriate Order shall issue.

Date: 2/5/26  
Richmond, Virginia

/s/  
M. Hannah Lauck  
Chief United States District Judge